61 F.3d 917
 41 ERC 1741
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America Plaintiff-Appellee,
v.
Lenny HART, Defendant-Appellant.
 No. 94-1005
 United States Court of Appeals, Tenth Circuit.
 July 28, 1995.
 
 1
 Before BALDOCK, EBEL, Circuit Judges, and BROWN, Senior District Judge.[2]
 
 ORDER AND JUDGMENT[1]
 
 2
 Defendant-Appellant Lenny Hart ("Hart") pled guilty to three counts of falsifying reports in violation of the Clean Water Act, 33 U.S.C. 1319(c)(4), in exchange for dismissal of multiple charges, including two counts of improper hazardous waste disposal in violation of the Resource Conservation and Recovery Act, 42 U.S.C. 6928(d)(2)(A). At sentencing, the district court found by a preponderance of the evidence that Hart committed the two dismissed dumping charges and treated them as "relevant conduct" under 1B1.3(a)(2) of the United States Sentencing Guidelines ("the Guidelines" or "U.S.S.G."). Hart brought this appeal to challenge his sentence on numerous grounds. We affirm.
 
 BACKGROUND
 
 3
 From 1980 to 1990, Hart was employed as a Class C operator at the Wheat Ridge Sanitation District ("the District"). Hart conducted laboratory work and prepared reports on the plant's operations, including monthly discharge monitoring reports ("DMRs"). In October, 1989, the plant's superintendent resigned, and the District temporarily assigned Hart to that position until it could hire a qualified Class A operator to fill the job on a permanent basis.
 
 
 4
 During Hart's time as interim superintendent, Hart was allegedly responsible for having several of his subordinates clean out the District's garage in October of 1989 and improperly dispose of acrylamide that had been stored there by dumping it into the plant headworks without a permit. Between March and August of 1990, Hart also allegedly made numerous false entries on the plant's monthly DMRs, by failing to report test results demonstrating that the plant had exceeded its permit parameters for residual discharge levels of chlorine, oil, and grease.
 
 
 5
 Based on this conduct, Hart was charged with seven counts of illegal reporting for falsifying DMR entries in violation of the Clean Water Act ("C.W.A."), and three counts of illegal dumping for improperly disposing of acrylamide in violation of the Resource Conservation and Recovery Act ("R.C.R.A."). Hart decided to enter into a plea agreement in which the government agreed to dismiss the three R.C.R.A. dumping counts and four of the C.W.A. reporting counts in exchange for guilty pleas to the remaining three C.W.A. reporting violations.
 
 
 6
 At the district court hearing to decide whether to accept Hart's plea, the court warned Hart that it might consider the three dismissed R.C.R.A. dumping charges as "relevant conduct" under U.S.S.G 1B1.3(a)(2). Both parties objected to this suggestion and subsequently filed memorandum to that effect. However, after considering this warning, Hart reiterated his desire to enter the plea agreement, and it was accepted by the district court.
 
 
 7
 The probation department then filed its presentence report ("PSR") recommending a total offense level of 15. This was predicated on a base level of eight under U.S.S.G. 2Q1.2,[3] a six-level enhancement for repetitive discharge under 2Q1.2(b)(1)(A), and a three-level reduction for acceptance of responsibility under 3E1.1(b). The PSR also treated the dismissed acrylamide dumping charges as "relevant conduct" under 1B1.3(a)(2), which required an additional four-level enhancement. See U.S.S.G 2Q1.2(b)(4). Both parties filed objections to the PSR, again arguing that the dismissed R.C.R.A. dumping charges lacked the necessary nexus to the C.W.A. reporting convictions to be treated as relevant conduct at sentencing.
 
 
 8
 At the sentencing hearing on September 17, 1993, the district court rejected both parties' objections and held that it could use the dismissed R.C.R.A. dumping counts as relevant conduct under U.S.S.G. 1B1.3(a)(2). Both parties objected for a third time, and the government declined to put on evidence of the dismissed dumping counts, arguing that it was not required to go forward on every charge indicted. The court disagreed and continued the hearing. The court ordered both parties to return in October and offer evidence about the conduct alleged in the dismissed R.C.R.A. dumping charges, particularly the mens rea element.
 
 
 9
 The court resumed the sentencing hearing on October 7, 1993, in order to hear the requested evidence. The evidence showed that during Hart's time as interim superintendent, he ordered several of his subordinates to clean out one of the District's garages in order to make space for a lunchroom. In the garage were stored several bags containing the hazardous material acrylamide, which the employees dumped into the plant headworks without proper disposal treatment and without a required permit. Conflicting testimony was presented as to whether Hart directly ordered the dumping or simply failed to instruct the employees on proper disposal techniques.
 
 
 10
 Based on this testimony, the district court found by a preponderance of the evidence that Hart was responsible, at least as an aider and abettor, for having acrylamide dumped into the plant headworks without a permit on at least two occasions. The court also found by a preponderance of the evidence that Hart possessed the requisite mens rea for the disposals to constitute R.C.R.A. violations--i.e., that he "knew" that the material was hazardous and that the method of disposal could harm the environment. The court then interpreted U.S.S.G. 1B1.3(a)(2) to conclude that the dumping offenses should be considered "relevant conduct" with respect to Hart's reporting violations.
 
 
 11
 Once a court determines that unconvicted conduct is "relevant," the Guidelines require the court to include that conduct when calculating the sentence for the convicted offenses. See U.S.S.G. 1B1.3(a). In this case, the sentence for Hart's convicted reporting offenses is calculated under U.S.S.G. 2Q1.2. One of the specific offense characteristics listed in that guideline says: "If the offense involved transportation, treatment, storage, or disposal without a permit or in violation of a permit, increase by 4 levels." U.S.S.G. 2Q1.2(b)(4). Because the conduct that the court deemed "relevant" involved disposal without a permit, the court applied this four-level increase. See U.S.S.G. 1B1.3(a)(ii). The court also found Hart's acceptance of responsibility to be equivocal, and therefore denied offense level reductions under 3E1.1. Otherwise, the court adopted the recommendations in the PSR. Thus, the court calculated a total offense level of 18 and imposed a 27-month sentence, the minimum sentence in the corresponding Guideline range. Hart then brought this appeal.
 
 DISCUSSION
 
 12
 In this appeal, Hart challenges his sentence on multiple grounds. Most significantly, Hart argues either: (1) that the district court misapplied the Guidelines by treating his two dismissed R.C.R.A. dumping charges as relevant conduct for sentencing on his three C.W.A. reporting convictions; or (2) that if the court correctly applied the relevant conduct guideline, that application violates his Due Process rights by punishing him for offenses that were never proved beyond a reasonable doubt, see In re Winship, 397 U.S. 358, 364 (1970). We address and reject these contentions respectively in Parts I and II below. Because we also dismiss Hart's remaining challenges in Part III, we ultimately affirm his sentence in all respects.
 
 I. Relevant Conduct
 
 13
 We review the district court's legal interpretations of the Guidelines de novo and its underlying factual findings for clear error. United States v. Lambert, 995 F.2d 1006, 1008 (10th Cir.), cert. denied, 114 S.Ct. 333 (1993). The guideline at issue here is the "Relevant Conduct" guideline, U.S.S.G. 1B1.3. Section 1B1.3 begins with the general principle that a sentence must be calculated based not only on the offense of conviction, but also based on all "relevant conduct." Section 1B1.3(a) then defines several categories of "relevant conduct." The dispute in this case arises over the applicability of the second of these categories, which includes:
 
 
 14
 solely with respect to offenses of a character for which 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction.
 
 
 15
 U.S.S.G. 1B1.3(a)(2).
 
 
 16
 For Hart's dismissed R.C.R.A dumping counts to be brought within the scope of this provision, three prerequisites must be met. First, there must be a finding that Hart engaged in conduct described in the preliminary subdivisions (1)(A) or (1)(B). Subdivision (1)(A) broadly includes all acts committed or aided and abetted by the defendant.[4] The district court reviewed all the evidence at the sentencing hearing and found that Hart was responsible, at least as an aider and abettor, for two incidents of illegal acrylamide dumping. Because this is a factual determination that finds support in the record, we affirm the court's finding as not clearly erroneous.
 
 
 17
 Second, the dismissed acrylamide dumping offenses must be the type of violations that would have been grouped together with the C.W.A. reporting offenses for sentencing purposes under U.S.S.G. 3D1.2(d), if Hart had been convicted of both. We address this issue in Part A and affirm the district court's holding that the offenses would have been grouped together under 3D1.2(d).
 
 
 18
 Third, the dismissed dumping offenses and the C.W.A. reporting convictions must have been "part of the same course of conduct or common scheme or plan." We address this factual inquiry in Part B and affirm the district court's finding that the R.C.R.A. dumping offenses and the C.W.A. reporting convictions were part of a common scheme or plan.
 
 A. Grouping Under U.S.S.G. 3D1.2(d)
 
 19
 As the relevant conduct guideline instructs, we must initially determine if the dismissed R.C.R.A. dumping charges and the C.W.A. reporting crimes would have been grouped under U.S.S.G. 3D1.2(d) if Hart had been convicted of both. The grouping provisions in 3D1.2 were designed to help calculate a single offense level that most accurately reflects the combination of all the counts for which a defendant is convicted. See U.S.S.G. ch. 3, pt. D (intro.). To achieve this result, the guideline sets forth the general rule that "[a]ll counts involving substantially the same harm shall be grouped together." Subparts (a) through (d) then define four categories of offenses that involve "substantially the same harm" within the meaning of this rule. The only groupable offenses that may qualify for treatment as relevant conduct under U.S.S.G. 1B1.3(a)(2) are those in the category defined in subpart (d).
 
 Subpart (d) requires grouping:
 
 20
 [w]hen the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.
 
 
 21
 U.S.S.G. 3D1.2(d). Subpart (d) contains a nonexhaustive list of specific offenses that must be grouped under this definition and specific offenses that may not be grouped--neither of which include the dumping or reporting violations in this case. However, 3D1.2(d) explains that for unlisted offenses, "a case-by-case determination must be made based upon the facts of the case and the applicable guidelines (including specific offense characteristics and other adjustments) used to determine the offense level."
 
 
 22
 The district court conducted this case-specific analysis and concluded that the dismissed dumping counts and the convicted reporting violations were groupable. Hart challenges this conclusion, arguing that 3D1.2(d) was intended only to apply to a narrow category of "fungible item crimes," in which sentences are determined primarily by aggregating the amounts of drugs or money involved. While we agree that subpart (d) applies most frequently to fungible item crimes that base sentencing on "the total amount of harm or loss" or "the quantity of a substance involved," those types of offenses make up only part of the category that subpart (d) defines.
 
 
 23
 The remainder of subpart (d) states that offenses will also be grouped "if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior." The commentary explains that this category will apply to "many environmental offenses" that "contain provisions dealing with repetitive or ongoing misconduct," and the notes include an example of groupable environmental offenses. U.S.S.G. ch. 3, pt. D (intro.); see cmt. n. 6, example 7. Thus, it is clear that environmental offenses may be grouped under U.S.S.G. 3D1.2(d), if those offenses (1) involve behavior that is ongoing or continuous in nature, and (2) are sentenced under a guideline that assesses sentence severity based on that characteristic. We conclude that the dumping and reporting offenses in this case meet both criteria.
 
 
 24
 The district court made a factual finding that the two acrylamide dumping offenses and the three reporting violations were "ongoing and continuous in nature," and we uphold this finding on this record as not clearly erroneous. All five violations occurred during the discrete, relatively short time period in which Hart was serving as interim superintendent. During this time, the water was polluted twice with acrylamide, and then polluted for a three month period with excess discharges of chlorine, oil, and grease. Due to the number of repetitions of similarly-motivated environmental offenses within an identifiably discrete time period, we must affirm the district court's finding that the offenses were ongoing and continuous. Guideline 2Q1.2, under which both sets of offenses would be sentenced, is also clearly structured so that the offense level accounts for "ongoing, continuous, or repetitive discharge, release, or emission" into the environment. See U.S.S.G. 2Q1.2(b)(1)(A). Accordingly, we affirm the district court's conclusion that the R.C.R.A. and C.W.A. offenses were groupable under 3D1.2(d), thus fulfilling the second relevant conduct requirement.
 
 
 25
 B. Same Course of Conduct or Common Scheme or Plan
 
 
 26
 The third requirement in the relevant conduct analysis requires a factual finding that the dismissed R.C.R.A. dumping offenses were either part of "the same course of conduct" or part of a "common scheme or plan" as the C.W.A. reporting convictions. The district court found that the offenses met both alternatives. Because the court did not clearly err in finding the existence of a "common scheme or plan," we need not address whether the offenses were also part of the same course of conduct in order to affirm the court's finding that the third requirement was met.
 
 
 27
 The district court correctly began its analysis by looking at the commentary to U.S.S.G. 1B1.3(a)(2). The commentary explain that "[f]or two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." U.S.S.G. 1B1.3 cmt. n. 9(A). After reviewing the record, the district court found two of these common factors to be present. First, the court found that the dumping and reporting offenses "reflected the same underlying purpose," which was to convince the District that Hart could perform the superintendent's position well enough to be retained on a permanent basis. Second, the court found that the dumping and reporting offenses involved a common victim, which was "the societal interest in maintaining an unpolluted environment," that had been harmed by introducing substances into the plant's waste water. See U.S.S.G. 3D1.2, cmt. n. 2 (explaining that for "offenses in which there are no identifiable victims," the victim is "the societal interest that is harmed"). Because these findings find support in the record and are not clearly erroneous, we must affirm the court's conclusion that the dismissed dumping offenses and the convicted reporting offenses were part of a common scheme or plan. Cf. U.S.S.G. 3D1.2(b) Supp. Illus. at 5, Example B.4 (Dec.1987) (explaining that a conviction for mishandling environmental pollutants and a conviction for recordkeeping violations in connection with the mishandled pollutants would be considered part of a common scheme or plan).[5]
 
 
 28
 Because the court correctly determined: (1) that Hart was responsible for the unconvicted R.C.R.A. dumping offenses; (2) that the R.C.R.A. dumping offenses would have been grouped with the C.W.A. reporting convictions under U.S.S.G. 3D1.2(d) if Hart had been convicted of both; and (3) that the R.C.R.A. dumping offenses and the C.W.A. reporting convictions were part of a common scheme or plan, we affirm the court's use of the dumping offenses as relevant conduct at sentencing. Thus, we affirm the four-level enhancement thereby imposed.
 
 II. Due Process
 
 29
 Hart's second contention is that if the district court correctly applied the relevant conduct provision to his unconvicted dumping offenses, that application violated his due process rights by punishing him for offenses that were never proved beyond a reasonable doubt, see In re Winship, 397 U.S. 358, 364 (1970). Although this argument has never been addressed directly by the Supreme Court, it appears to be foreclosed in this circuit. See United States v. Washington, 11 F.3d 1510, 1516 (10th Cir.1993), cert. denied, 114 S.Ct. 1404 (1994); United States v. Frederick, 897 F.2d 490, 492-93 (10th Cir.1990), cert. denied, 498 U.S. 863 (1990). Moreover, its reasoning has been directly undercut by the Supreme Court's recent case of Witte v. United States, 115 S.Ct. 2199 (1995), which was decided during the pendency of this appeal. In Witte, the Court held that, for purposes of Double Jeopardy analysis, "consideration of relevant conduct in determining a defendant's sentence within the legislatively authorized punishment range does not constitute punishment for that conduct," but constitutes punishment "only for the offense of which the defendant is convicted." Id. at 2205. Although Witte did not address the Due Process challenge that Hart raises in this case, it suggests that considering the dismissed dumping offenses in determining Hart's sentence for the reporting convictions would be considered "punishment" only for the reporting convictions. If the resulting four-level enhancement does not constitute "punishment" for the unconvicted dumping offenses, it does not implicate In re Winship 's requirement that punishment be imposed only for offenses proved beyond a reasonable doubt. Of course, if the unprosecuted conduct contributed so disproportionately to the sentence or was so unconnected to the convicted offense that the defendant indeed was being punished for the unconvicted conduct, constitutional protections could still attach. See McMillan v. Pennsylvania, 477 U.S. 79, 88 (1986) (noting that In re Winship would be implicated where the unconvicted conduct becomes "a tail which wags the dog of the substantive offense"). However, the district court found that this was not a "tail wagging the dog" case, because considering the conduct charged in the dismissed dumping counts resulted in only a four-level enhancement and a guideline range that is less than double what it would have been if the dumping offenses were ignored. We agree. Accordingly, we reject Hart's challenge to his sentence on due process grounds.
 
 III. Other Issues
 
 30
 Hart also challenges his sentence on four additional grounds, which we reject in turn.
 
 A. Separation of Powers
 
 31
 First, Hart argues that when the district court required the government, over the government's repeated objections, to present evidence at the sentencing hearing about the R.C.R.A. charges that the government had agreed to dismiss, the court effectively compelled the government to breach its plea agreement. Hart contends that this compelled breach violated the constitutional doctrine of separation of powers.
 
 
 32
 This argument fails because, contrary to Hart's assertion, the government did not breach the terms of Hart's plea. Because Hart "was not charged or convicted of any crime[s] except the crime[s] to which [he] pled guilty," presenting evidence on the R.C.R.A. offenses for sentencing purposes did not compromise the government's agreement not to prosecute those counts. Frederick, 897 F.2d at 491 n. 1 (dicta); United States v. McGee, 7 F.3d 1496, 1499 (10th Cir.1993) (holding that it was "proper" for the government to use conduct underlying counts that the plea agreement agreed to dismiss for purposes of relevant conduct analysis at sentencing). Hart's plea agreement clearly stated that the court was free to reject the government's sentencing recommendation and, more importantly, it explicitly reserved the government's right to litigate facts regarding any relevant conduct at issue. Therefore, because the government's conduct did not breach Hart's plea agreement, Hart is precluded from arguing that the breach formed the basis of a separation of powers violation.
 
 B. Acceptance of Responsibility
 
 33
 Hart also challenges the district court's refusal to reduce his offense level for acceptance of responsibility under U.S.S.G. 3E1.1. Whether a defendant clearly demonstrates acceptance of responsibility for his offense in order to obtain a 3E1.1 reduction is a factual finding that we review only for clear error. United States v. Dahlman, 13 F.3d 1391, 1398 (10th Cir.1993), cert. denied, 114 S.Ct. 1575 (1994). Because the sentencing judge "is in a unique position to evaluate a defendant's acceptance of responsibility," we give the district court's decision on this issue "great deference on review." U.S.S.G. 3E1.1 n. 5.
 
 
 34
 The district court properly analyzed Hart's acceptance of responsibility only with respect to the three convicted offenses, and not the offenses treated as relevant conduct. See U.S.S.G. 3E1.1 n. 1(a). The court found that Hart had not unequivocally accepted responsibility for the reporting violations and was therefore ineligible for a 3E1.1 reduction. The court explained that Hart had provided "implausible" after-the-fact rationalizations for failing to report test results that showed excessive discharge levels, and had "claim[ed] that he really was proceeding in real innocence, although technical guilt." Because this finding has adequate support in the record and is not clearly erroneous, we affirm the court's denial of a 3E1.1 reduction.
 
 C. PSR Disclosures
 
 35
 Hart also argues that the district court abused its discretion by denying his request to review portions of the PSRs that were prepared for other defendants in three prior unrelated prosecutions for environmental offenses in his district. Hart requested the portions of those PSRs that described the offenses, offender characteristics, sentencing options, and specific sentencing recommendations. Hart wanted to use this information to help support an argument that the sentence recommended in his PSR was disproportionate to PSR recommendations for other similarly-situated defendants, thus violating his "due process right to parity." Hart claims that by making it more difficult to prove this argument at his sentencing hearing, the court's ruling undermined the Sentencing Reform Act's objectives of proportionality and uniformity, denied him his right to effective assistance of counsel, "precluded him from making a mitigation argument on appeal," and "prevented him from fully exercising his right of allocation."
 
 
 36
 Hart's argument lacks foundation because he possessed no viable claim to access to other defendants' PSRs. To the extent that Hart was requesting the actual sentence recommendations contained in those PSRs, we believe that the version of Fed.R.Crim.P. 32(c)(3)(A) governing Hart's sentencing precludes such a request by logical implication. Because Rule 32(c)(3)(A) at that time denied defendants a right to disclosure of "any final recommendation as to sentence" contained in their own PSRs, it would be anomalous to acknowledge a right to disclosure of sentence recommendations in others ' PSRs. See Fed.R.Crim.P. 32(c)(3)(A); United States v. Ainesworth, 716 F.2d 769, 771-72 (10th Cir.1983) (holding that the portion of a defendant's own PSR containing "an outline of sentencing alternatives and the naked recommendation" is "clearly subject to nondisclosure" under a prior version of Fed.R.Crim.P. 32(c)(3)(A)).
 
 
 37
 With respect to Hart's request for other portions of the PSRs, we agree with the district court that the "extremely marginal relevance" of that information "is considerably outweighed by the considerations of confidentiality." As we have noted in the past, "[a] presentence report is prepared exclusively at the discretion of and for the benefit of the court.... [It] is not a public record, it is a confidential report for the use of the Judge of the Court in his effort to determine what a fair sentence should be." United States v. Dingle, 546 F.2d 1378, 1381 (10th Cir.1976) (internal quotes omitted), questioned on other grounds, United States v. Sasser, II, 971 F.2d 470, 479-80 (10th Cir.1992). Accordingly, we have recognized the need to protect the confidentiality of PSRs "to insure the free flow of information" in order to facilitate knowledgable, intelligent, and effective sentencing decisions. Id. Because the district court's ruling properly reflected these principles, we hold that its denial of Hart's disclosure request was not an abuse of discretion.
 
 D. Mens Rea Evidence
 
 38
 Hart's last contention is that his sentence must be reversed because the district court failed to consider his mitigating mens rea evidence. It is unclear whether Hart is arguing that the court did not consider such evidence with respect to the dismissed R.C.R.A. dumping offenses used as relevant conduct, or with respect to the convicted C.W.A. reporting offenses. In either event, Hart's argument lacks merit. The district court expressly considered all of Hart's evidence regarding the knowledge element of the acrylamide dumping offenses. In fact, the court delayed the sentencing hearing precisely to allow the parties time to obtain and present this mens rea evidence. The district court also expressly considered and rejected as non-credible Hart's evidence that he did not possess the requisite mens rea for the C.W.A. reporting offenses. That was the very evidence which the court relied on to deny an offense-level reduction for acceptance of responsibility. Thus, we reject Hart's argument that his sentence must be set aside for failure to consider mitigating mens rea evidence.
 
 CONCLUSION
 
 39
 For the reasons stated above, we AFFIRM.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 The Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation
 
 
 [3]
 This provision is part of the section on "offenses involving the environment," and it applies specifically to offenses involving "Mishandling of Hazardous or Toxic Substances or Pesticides; Recordkeeping, Tampering, and Falsification; [and] Unlawfully Transporting Hazardous Materials in Commerce."
 
 
 [4]
 The parties and the district court agreed that subdivision (1)(B) is inapplicable. That subdivision includes foreseeable acts and omissions by persons other than the defendant that were taken in furtherance of a joint criminal activity in which the defendant participated. U.S.S.G. 1B1.3(a)(1)(B)
 
 
 [5]
 This example is taken from a different Guidelines provision that contains the same common scheme or plan requirement. U.S.S.G. 3D1.2(b) (requiring grouping of convicted offenses that "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan"). Other courts have used examples in the commentary from this provision to help interpret the identical "common scheme or plan" language contained in U.S.S.G. 1B1.3(a)(2) which is at issue in this case. E.g., United States v. Duran, 15 F.3d 131, 134, 134 n. 5 (9th Cir.1994) (per curiam)